to Chief Judge Irene Keeley of the Northern District of West Virginia, who is continuing to serve with us this week and is providing us not only with a great deal of help in getting to our cases, but the wisdom that comes with being an experienced district judge and seeing things from the other perspective, other than the one that we typically see them from. So Judge Keeley, welcome to you. And we'll proceed to the cases. The first case on for argument today is number 2006-1574, TIVO v. Echostar. Mr. Dunner. Good morning, Your Honors, and may it please the Court. Echostar submits that there are at least three reasons why the decision below should be reversed, and I'd like to restrict myself to those three reasons, and thus the Court wants to deal with the others. Two of those reasons have to do with what we call the hardware claims, 1 and 32. And it deals with the separated limitation and the assembled limitation. And the third issue deals with the software claims, 1 and 32, and that deals with the requirement that a source object extracts video and audio data from a physical data source. Let me deal first with the separated limitation of the hardware claims. There's no dispute that the Echostar DVRs don't physically separate the video and audio components. That's not the issue. The issue is whether or not physical separation is required or logical separation is required. The District Court declined to construe separated, but we submit that the specification and the claims clearly establish that physical separation, not logical separation, is required. Now, if we were to conclude that the proper claim construction is the one proposed by TIVO, that is, logical separation is sufficient, I know that's contrary to your position, but if we were to conclude that, then I suppose the district judge's failure to actually give a construction to the jury would not matter, right? It wouldn't be prejudicial to you. If anything, it would have been potentially prejudicial to them, but it wouldn't matter to you. I agree. Okay. So the real question is just whether the construction is logical or physical. Exactly. In that case, I think we have to decide. Okay. Before you jump too quickly past that, let me be sure I understand your position, Mr. Dunner. You're suggesting that Markman does not require the District Court to instruct the jury with regard to whether the District Court can choose not to do it, and if it turns out that the construction that wins is a favorable one, can the District Court escape any colony for having failed to construe it? Is that your position? Your Honor, it's my view that Markman does require the District Court to construe the disputed claims. Was this claim clearly disputed before the District Court? Yes, because we argued below that separated meant physical separation. And they argued the opposite? Yes. But Judge Bryson asked me if this panel concludes that the decision was correct, that in fact it requires logical separation, we are not challenging that. We don't need to challenge that. We have more recognition than I know how to use. So you're not going to stand on the proposition that the failure of the District Court to carry out its responsibilities and construe, i.e., instruct the jury about contested claims, you're not going to argue that that's an R.I.P.? Not today. I don't mean tomorrow. Not in this case. We'll reserve that for the future. I'm actually trying to be cute. That's fine. We understand. The specification makes absolutely clear that we're talking about physical separation. If you look at the summary of the invention in column 2, it says, the invention, not the preferred invite, the invention, parses the resulting MPEG screen and separates it into its video and audio, components, plural. It then stores the components, plural, into temporary buffers, plural. Buffers are a storage device. We're talking about separation here. The drawings, figures 3, 4 and 6, particularly 3, basically shows a stream coming in, an MPEG stream with video and audio components and separating them into a video stream, stream and audio stream. And figure 6 does the same thing. The description of figure 3 is particularly instructive. It says that the elements, the video and audio elements, must be separated, not made, must. And it says it's necessary to separate them. And it talks about, set to create separate video 308 and audio 309 streams or buffers. Again, we're talking about plural buffers. You don't talk about plural buffers if you're just talking about logical separation. The only time that separate is used in the patent is to describe the division into separate streams. Now, how does TiVo respond? Well, they respond, they say, it really means logical separation. And what we're really talking about for separation is creating an index. And there's nothing in the spec that says that index needs to be created after you separate. Well, that's just not so. And if you look at figure 6, which is described in column 5, figure 6 shows the media switch. That's where the separation takes place. And it creates, at the same time, a video buffer, audio buffer and event buffer. It also says private data buffer. What that means is the video components go into the video buffer, the audio components go into the audio buffer, and at the same time, an event buffer is created to identify where in those streams those components are. And then you look, and from the event buffer, it goes to events translated to logical segments. That happens later. That is the creation of the index. And if there was any doubt, one of the inventors, Barton, at 1352, lines 20 to 23, this is significant, I'll quote it, the video and audio are briefly separated as we do the analysis in order for us to build this table. The table is the index. And then they are reassembled into a stream for storage on the disk drive. So much for the separated component. The assembled component, it deals with the 50X DVRs. The separated component deals with the Broadcom DVRs. We don't dispute that the 50X DVRs separate the video and audio streams contrary to the position of the Broadcom DVRs. But we do insist that they don't assemble, they don't assemble into a single stream the audio and visual video components. Now, Pico doesn't take issue with that. But they say it doesn't matter because the claim language is broad enough to cover a separate video stream and a separate audio stream. I say that's a total perversion of any English language translation of the claim which talks about assembling said video and audio component into an MPEG stream. Now, they cite a case with a proposition that the singular A or AN can mean a plural. Well, those same cases, Navel versus American Cyanamid and Norion versus Striker, basically say that may be a rule, but it's not a rule if it's inconsistent with the spec. And when you look at the spec, you find that it clearly is teaching you that there has to be a single stream of the audio and visual components and perhaps the best example of that is in column 2. And it says, when the program is requested for display, the video and audio components, plural, are extracted from the storage devices and reassembled into an MPEG stream, singular. The MPEG stream is sent to A to code it. Mr. Dunner, assemble was another word that was not construed even though it was contested. That's true. And you're again not contesting the failure of the trial judge to have construed. Not in this case. Not in this case and not today. So it went to the jury. Yes. You may remember pre-marking. These cases would come up to us and the construction of the claims was a matter that was given to the jury and it came up here in a black box and the only question was whether there was substantial evidence in the record to support the judgment or the verdict of the jury, rather, without our ever knowing exactly what it is the jury understood assemble or separate meant. Why aren't we in exactly that? And we would uphold the jury because we had no basis to do anything else. Why aren't we exactly in that same position? Your Honor. I don't know what the jury meant when it gave verdict for Tevo based on these arguments about assembly but I have no way of reviewing it. Your Honor. Nor do I. And is there substantial evidence in the record to support any possible meeting of assembly that might come out the way the jury thought it did? Your Honor. There is no evidence because the issue turns on claim construction. The issue turns on... They don't challenge our proposition that in fact... But the jury believed Tevo's claim construction. Isn't that the end of the case? No, because claim construction is a question of law and the question is what does assembled mean and the question is what does separated mean. No, the question is what did jury think it meant. Your Honor. I don't know what the jury thought it meant. We are arguing since they don't... Since on the two terms we're talking about they don't challenge the basic facts. There are no disputed facts that go into those two claim terms. The question in both cases, separated and assembled, turn on the question of law. What does the claim mean? If the claim means what we say it means then that ends it in our favor for the hardware claims. Now it may be that I had two arrows in my quiver and I could have shot two arrows. I'm shooting one. I feel very confident that we're on the right side of the issue for separated and assembled. I would hope you would. All right. I hope you agree with me. I'd like to then go into the source object, the software claims. And basically it's uncontradicted that that claim language requires that software remove the video and audio components from hardware on a chip, either the Broadcom chip or the 50X chip. And it's also uncontradicted that hardware, not software, hardware removes the video and audio components from these chips into a memory chip that is sitting next to, but it's separate from the Broadcom or the 50X chip. And here's where the issue comes. And they say our position is equivalent because they say it is clear that there's software in the Broadcom thing, it's iactual software. Software takes the video and audio components from this chip adjacent, the Broadcom chip, moves it through Broadcom chip and to a central computer. Now I say that is not in compliance with the claim language. The claim language requires that software extract it from the physical data source. Their expert, Gibson, identified five components comprising the physical data source on the Broadcom chip. And it is clear that the software is not removing it from those components. Two of those components remove the video and audio data from the chip to this adjacent chip next to it. And moreover, there is zero evidence that although they cited footnote 19 on page 52. I was just reading 19. I was hoping you would address that. If you look at the sites they have, there's no discussion of extracting software from physical data. There are drawings, there's software and what have you. Moreover, the Broadcom chip has a lot of components on it. Even assuming they can show that it goes through the Broadcom chip, they have to show that it goes through the physical data elements, which are five elements identified by Gibson. There's nothing showing that. There's no evidence. This is pure attorney argument on that point. And we submit the inadequate attorney argument. And I see... Well, we won't hold you strictly to your time. This is a complex case, and we want to have an opportunity for the parties to discuss with us the issues that they think we need to most particularly attend to. What about doctrinal equivalence with respect to the software claims? I mean, you say that these claims are not satisfied by the particular architecture. Your Honor, the doctrinal equivalence, if you look at A1640, line 6 to 11, you will see Gibson's testimony on the doctrinal equivalence. It was very conclusory. He answered yes to two questions. There's no particularized testimony. There's no linking argument, which is required by this Court's cases. We say that's totally inadequate to prove doctrinal equivalence. Okay. Now, I thought you began by saying you had three points. Perhaps we've covered them all. You said separated, assembled, and source-object? Yes. Very well. We'll save all of your rebuttal time. I appreciate that. Certainly. Before you sit down, let me be sure I understand. The extract issue is blended into the source-object issue. Is that what you're talking about? Yes, Your Honor. The extracted issue, basically, the language is providing a source-object, whereas the source-object extracts video and audio data from statistical data sources. Okay. Fine. Mr. Waxman? Okay. Please, the Court. Since Mr. Dunner restricted his argument to three points, I'll try and deal with all his points, but also honor Object Price's invitation to... I would be delighted to answer any questions the Court has about other things. I'd like to make two points first and then address Mr. Dunner's points, perhaps in reverse order, because it would be easier for me to remember. The first point is, with respect to Echostar's claim construction arguments here, it's important, I think, to bear two things in mind. First, Echostar has got to escape both sets of independent claims, the hardware of what's called the hardware claims and the software claims. Could I interrupt you on that point? I understand your argument that they're cumulative, in effect, but do they affect the scope? Suppose we should affirm in part and reverse in part. Does that affect the scope of the injunctive relief? No, nor the damages awarded. That was the question. Why wouldn't it affect the damages awarded? Because the jury... Echostar never sought to distinguish at trial or on appeal the amount of damages that were awarded depending on which claims were violated or not. The jury was told, without objection, that if it found an infringement of any claim of the patent with respect to the accused devices, it should proceed to determine damages. And they never suggested that if their machine infringes, for example, claim 1 rather than claim 61 or vice versa, the amount of damages would be different. They are infringing devices. And how about the injunction? The same with the injunction. That is, the injunction is directed at specified accused machines. If those machines violate the patent, it doesn't matter for injunctive purposes how many different independent or dependent claims they file. But did all the machines infringe, according to the jury, on both hardware and software, or were some of them one and not the other? No, all of the machines. The jury verdict, which is... The jury verdict really doesn't break it out that way. The jury was asked with respect to each of the named devices, the accused devices, separately whether it infringed the hardware claims 1 and 32 and the software claims 31 and 61. And it answered yes as to each single accused device with respect to both sets of independent claims. So your view is if we should hypothetically pick up the judge's hypothetical, if we should find that the hardware claims were not infringed but the software claims were infringed, you would say judgment... Has to be affirmed. Absolutely has to be affirmed. And the other point I want to make is that their claim construction arguments not only limit, but seek to limit the claims to selected embodiments, and I'll address this when we get to these separated in Figures 3 and Figure 6, but they also have little, if anything, to do with what it is that Thiebaud actually invented, which is hardware and software that parses a massive incoming data stream and separates it into component parts that can be efficiently transferred and manipulated. And you're rarely a case in which this court's reminder in Phillips that in construing and applying claims, a court must take careful account of what the inventor actually invented and intended to envelop in his claims is true. Now, I'm going to take Mr. Dunner's arguments in reverse order. He dealt last with the software claims. He didn't say anything about the claim construction, and if the court has questions, I'm happy to answer to present our position about why the court's construction of the software claims, that is, what a source object is, is correct, and why it was entirely correct, which is the de novo construction question here, to reject the 35-word limitation that Echo Star argued his point... What does the use of the term object add to the software claims? That is, wouldn't the software claims have been essentially the same if the word object had never been put in there and it was just source? No. In fact, if we can... I realize I'm off Mr. Dunner's points, but if you will look, for example, at claim 61, which is the very end of the patent, it's the easiest one to find, you will see we would have had a terminal section 112 problem if we hadn't used the word object. Object is used to indicate that it's denoting a collection of software, not hardware, and that it's denoting a noun, not a verb. Let me give you two specific examples in claim 61. Let's look at... The first element says providing a physical data source. It calls out the hardware, a hardware component element of this claim. It uses the word source. It is a source, but it says that it's a physical data source to indicate that this is hardware, and then it lists three different functions that that hardware has to perform. Okay, go to the next element. Providing a source object, etc., etc. If we didn't have the word object here, it would say providing a source wherein said source extracts video and audio data from said source. I mean, this claim would have been rejected. Similarly, if you look at, let's say, the penultimate element, providing a control object, if, let's say, we didn't use the word object, it would have said providing a control wherein said control receives commands from a user, or said commands control the flow of the broadcast data through the system. And the specification similarly indicates that this is a word to denote a collection of instructions and data. But you're not going so far as to say this collection has to be any particular architecture at all, as long as it is functions to perform this particular role in the operation, correct? That's right. The argument is that the term object invokes a certain kind of architecture, and C++ are the like. You say no. If I understand your argument, it is that all the word object does here is to effectively say software. Well, when you say collection, that doesn't add anything, does it? The patent discloses an architecture that uses four interacting collections of software subroutines that trade data back and forth. It does not require, and this is their claim construction, which they pressed at Markman and at the jury charging conference, was that the word object requires the use of a particular type of programming language that uses two specific programming techniques, inheritance and encapsulation. That's what they argued for. That's what they get de novo review for. Now, our position is that it happens that the district judge's construction is absolutely correct. And there was testimony, your honor, both at the Markman hearing and the trial that this software using objects can be written in any number of different languages, object-oriented languages and non-object-oriented languages. And even if it's written using an object-oriented language, it doesn't have to use encapsulation and inheritance, which they say is required. Now, the thing that's still troubling me is I'm not sure what is added by your term collection. I mean, it sounds as if you said this wasn't so, but maybe you can tell me why. That it sounds as if what you're saying is as long as the software performs the function, then the term collection is just a way of describing whatever software is necessary and is used to perform that function. Is that right, or does the word collection add something, in your view, to the term software? It does add something, and Dr. Gibson explained it both at Markman and in front of the jury. Of course, which is collection. Let me just finish my throat clearing. Also, recall that this is a substantial evidence point. This is not a construction point. They're not challenging the construction of the word collection here. Their point is that the testimony didn't show either that there was a collection of instructions, or, and this is the point that Mr. Gunner raised, or that the source object was performing its extraction function from the physical data source, which I am going to address in the very next sentence, but Dr. Gibson testified, and the jury was entitled to credit his testimony, that the functionality, that a collection is no more required to be in the same subroutine in how the human source code is written than an impressionist collection has to be in the same gallery. He went through, he's the only expert who read all of the source code for all of the machines, and his testimony identified piece by piece where every piece of code for the source object, the transform object, the sync object, and the control object was, and he showed, and this is the point, this is what a collection is, he showed that those subroutines are connected logically, that they all refer to, call upon, and relate to each other, and that they pass data one from the other, so the evidence was certainly sufficient. Now with respect to this physical data source, again, this is a substantial evidence point, Dr. Gibson testified, he identified with respect to the machines what the physical source object was with respect to each machine, and he did it with reference to the language of the claim, the physical source object is hardware that performs the three functions that are listed in the first element. Now, their argument here is, their only argument is that with respect to some of their machines, some portion of the last function temporarily stores said video or audio data is contained in part on buffers that aren't on what they call the Broadcom chip, but on a little temporary memory chip that resides close to, next to, but not on that chip. This is your footnote 19, your famous footnote 19. First, I'm glad to hear that it's famous. First of all, that chip... It's famous only because I couldn't understand the thing in it. You're going to explain it, I'm sure. I hope I can explain it and at least touch on the other two points that Mr. Dunner is raising. The point here is that that little chip that they say, ah-ha, it's not part of the physical master... If you're concerned about time, again, I think we'll restore an equal amount of time to Mr. Dunner. I don't know of any other independent issues, only Mr. Dunner's. The famous footnote 19, I have to say, Judge, that I had the same reaction when I finally sat down and read that logistical document. I hope I can understand it. The scary thing is I think I do understand it now. Fortunately, I don't have that fright. The question is was there substantial evidence that these particular broad thumb boxes have a physical data source? And that they have a data source from which the source object extracts video and audio data. Those are the first two elements. Answer to point one, a physical data source is, and nobody disagrees with this, is hardware that performs these three functions. In different boxes there's different pieces of hardware and they're called different things and the diagrams look differently, but it has to be a piece of hardware that performs these three functions. This little neighborly auxiliary chip that they're talking about performs the third function, and therefore it is part of the physical data source. Now what they say is, oh, but when Dr. Gibson highlighted the schematic of this particular machine, he didn't draw a line, he didn't include in his box that little chip. Well, okay, it's still part of the physical data source. But even if it worked, let's just assume this little neighborly chip, I don't know what it would be if it's not the physical data source because it is used for temporarily storing video and audio data, but let's just assume it isn't. He also testified, he identified the specific software commands, the source object, and in particular the input-output control instruction, the IOCTL instruction, and he explained that without that software the Broadcom chip, which is what they say is the sum and substance of the physical data source, wouldn't do anything. It's the IOCTL command, it goes to the Broadcom chip and says to the Broadcom chip give us the audio and video data. Now, they say, but what actually happens in our machines is that in order for the Broadcom chip to get some or all of that data, it itself has to extract it from this little neighborly chip. But that's irrelevant for purposes of the second element. We have a software command, or set of commands, that tells the Broadcom chip, which is what they say is the physical data source, give us the data, and it extracts the data from the Broadcom chip, whether it gets it from memory buffers on that chip or memory buffers on a chip next to it. That's my best explanation. Now, with respect to his assembles limitation, again, this is a substantial, and he's raising a substantial evidence point here, not a I do want to pick up on something, Judge Pleasure, that you said. There was not a refusal by this judge to construe any claim term requested. They don't, he was asked to construe the assembles limitation, and he did. They may not like the way he construed it, but he did. And when I get to separates, I'll make the same point. They didn't ask for a limitation. They asked that that limitation also include the words separate video and audio streams, and I'm going to address that in a minute. But there was no refusal by this district judge to construe a single claim that was requested. He did. Construction, as this court has made clear just last week in Verizon versus Vonage, doesn't mean that you have to elaborate on every word that any party wants you to. You have to look at it. You have to ascertain whether elaboration is required in order for a jury to determine whether a person with ordinary skill in the art would understand it and make a decision. And that decision rises and falls on a de novo review by this court. Maybe I misunderstood the record then. I thought the term assemble was specifically disputed. The term assemble was specifically disputed as to exactly what it meant. Am I wrong about that? I cannot recall what the party's claim construction positions were at market, but the argument that I understand from Mr. Dunner's brief and from him this morning is an argument about application, which is what he's saying is... He basically waived the question of whether the trial judge construed the term assemble. But what's been nagging at me, obviously more than it nagged at Mr. Dunner, was if the claim term assemble was presented to the trial judge and said, judge, this is a critical term, because it could mean this or it could mean that, and that has a big impact on the infringement issue. If the trial judge then said, I'm sorry, I'm not going to construe it, the jury can decide what it means, that troubles me. Do you think that's what happened? You're saying, no, that isn't what happened. I don't think that's what happened, and if it were what happened, as Judge Bryson's, I think, initial question reflected, it only benefited Echostar. Echostar was allowed... Assuming you're right on the claim commission. Assuming I'm right, and if we're wrong, then we're back to the district court in any event on a different claim construction. But their assembled point is this. What they say is, okay, we have two different kinds of machines. We have the 50x machines and we have the Broadcom machines. And our 50x machines store video and audio data separately, and when a command comes that somebody wants to watch a program that's stored, they are assembled into separate streams, video and audio streams, and therefore they don't meet the assembled limitation, which says, I'm reading from claim one, the output section assembles said video and audio components into an MPEG stream. Now, the specification, in fact the language that they most like to put with respect to figure three, which indicates that at output, separate streams are necessary because audio and video are decoded separately. We're dealing here with respect to this assembled limitation with two cold, immutable facts of electrical engineering. One has to do with the hard drive and hard drive technology, and the other has to do with decoders. Hard drives, as you may know, store information in sort of magnetic arrays with different orientations, and only God and the person who designed the hard drive knows when you say, save my emails, or all my emails to Waxman on the hard drive. It doesn't store them together. It puts them according to some algorithm that we can only hope that when we call back our emails, they'll be there. They're stored not as streams, they're stored as little magnetic orientations that correspond with data. And so when somebody wants to watch a television program, which does require an audio-video stream, it has to assemble it. That's what assembled means. That's what assembled requires. Now, his point is, okay, fine, but this says it has to be assembled into a single MPEG stream, and we don't do that. We send an audio stream to the audio decoder, and a video stream to the video decoder. Well, the reality is that audio and video have to be decoded separately. They have different rates, they have different characteristics, they use different algorithms. Now, you can have a box in your machine that says, this is the decoder. That's what their Broadcom boxes have. It shows one decoder. Inside that decoder, and their specifications and drawings clearly indicate this, there are separate video and audio elements that have their own algorithms, and by the time these streams meet their algorithm, they had better be audio only or video only, and their instructions say that. Now, what's different about their 50X boxes is they don't have a big thing that says we only have one decoder. They have something that says we have a video decoder, and we have an audio decoder, and so there's no need to put them into a single place, because audio and video are stored on the hard drive as separate files. They're decoded separately, and the jury heard tremendous evidence about this. In terms of their substantial evidence point, there's no question that for all of their machines, data that is stored in an atomized form on the hard drive is assembled for output. It is decoded. It's decoded by separate video and audio decoders as is required by technology, and as the specification indicates, is necessary because of the different algorithms. Let me make sure I understand exactly what you're saying with respect to the assembly into an MPEG stream. There is, you say, notwithstanding the description of the 50X machine, you say they do assemble into a single MPEG stream? They have their Broadcom boxes assembled into a single MPEG stream because on their boxes, when they take the data and store it, and this will go to Mr. Dunbar's first point about separators, when they store data in their Broadcom boxes on their hard drive, the video and corresponding audio segments are stored together. I mean, who knows what the hard drive does with it, but they're stored in a single file. So, when it's assembled the way that the testimony showed, when it was assembled for output, fast forward, replay, regular play, whatever, so that a user, one of us, could actually appreciate the functionality of the invention, it's called up from the hard drive and put into a single stream, a transport stream that includes video and audio. And that stream, that single stream is then sent to a decoder? A decoder which has two different ... a box which says decoder, but it has two different sub-decoders in it, one for video and one for audio, because there's no dispute about this in technology or the evidence. Audio and video streams, the elementary, at some point before, in order to be decoded, a single transport stream has to be separated into an elementary stream of audio only and video only because otherwise the algorithm doesn't recognize what it is it's supposed to do. That's what I'm struggling with the language of the claim because the language of the claim seems to contemplate that assembly into, and I'm going to use the word an to mean a single and I know that you have an argument that a and an don't necessarily mean a single but let's assume for the moment that in this context it does. And then following that we say it sends the MPEG stream, single MPEG stream to a decoder which converts it into output. But you're saying that's not really the way it works. It can't. And you say the evidence doesn't really support that. Why isn't that what the claim is saying in terms of the sequence of events? Well, Senator Price, the question for this court, of course, is what a person having ordinary skill in the art would understand. Even persons having, I don't have ordinary skill in this art, but no one reading this specification thought, you know, this separation is necessary because separate audio decoders are required. No one looking at Figure 7, for example, that shows a separate audio decoder and video decoder, no one understanding that different algorithms, different apparatus applying different algorithms are required otherwise audio and video can't be decoded would understand it any other way. Would that person conclude that the claim had been mangled by the reference to assembly followed by decoding, or would that person say, well, they really intended to say the opposite? Well, let's take these elements in terms. The assembled element, the interpretive question is whether and. When it says an MPEG stream, it can mean an MPEG-2 audio stream and an MPEG-2 video stream. Okay, they're both MPEG streams, they're just elementary. They are, but if we, again, on the assumption that when the claim says an MPEG stream, if we conclude that that really means just one MPEG stream which has both components, is that not fair, you think? That's just not, you say that's not the right reading. It is technically, if you read it that way, as a single stream that even when it gets decoded is still only one transport stream, you're expressing a technical impossibility that the specification explains and the testimony explains. They don't, I mean, I don't have it in handy, but even if you look at the specifications, the drawings of the Broadcom chip that they're talking about that says it's only a single stream, it shows that there are separate sub-decoders, separate algorithms that are told in software, you are going to be processing an audio elementary stream, or you will be processing a video elementary stream, and therefore, I guess my answer to Bryson is you can have, and they do have, some machines, the evidence showed, when it assembles this disparate data from the hard drive for decoding, recreates it into a transport stream, but those machines have to separate, this is just physics, they have to separate that transport stream into elementary streams in order for the decoding process to work, because otherwise the algorithms can't decode the information. Now, their point I think is on assembles only relates to the other machines, these 50x boxes that don't do that. And our claim, our argument here is that anyone skilled in the art would understand that the word can MPEG stream can refer, has to refer, either to an MPEG transport stream, or an MPEG elementary stream. Now, either audio or video. Right, and that's exactly what their machines do, and there was no disputed evidence, perhaps substantial evidence, that that's why they met that claim limitation. Well, well, we can sort it out, but that seems in tension with the assembles said video and audio components into an MPEG stream. That sounds like it's not talking about, this is again in the wherein said output section limitations. That doesn't sound like it's less than containing both audio and video. That's, textually, that sounds like what it's describing. That is inconsistent with the intrinsic evidence and the extrinsic evidence, and more to the point, it's not, Mr. Dunbar mentioned a couple cases where this court had acknowledged or had applied the use of the singular article to mean the plural article. In CollegeNet, this court said that it is well settled that the term N or A ordinarily means one or more, and given the technical evidence in this case and the reality of the way decoding works, this is the paradigmatic example. And the drawings, Judge Bryson, the drawings themselves show separate decoders and single decoders and separate streams going into decoders and single streams. Now you're talking about, in part, Fig 7? I mean, these are, of course, embodiments. Yes. Well, now, I don't want to hold you unduly long. Perhaps I'm too late. But, I had a question about that. In the specification described, it's true that 715 on Fig 7 has an MPEG decoder and an audio decoder. And from just looking at the Fig, it looks like those are two different things, video on the one hand and audio. But the spec seems to say at the top of column 7 the decoded audio output from the MPEG decoder, so the MPEG decoder is not apparently just video, right? So I was, what do you make of that seeming inconsistency between the Fig and the spec? I... You see the language I'm talking about? I believe I see the language you're talking about. I don't think I have an easy answer for you except to say that the specification with respect to this particular embodiment and this particular figure, I think should be understood to be an explanation for perhaps a less than fully precise completely developed explanation for how the figure actually works. I mean, I... I am referring to the... I mean... Well, figures are just figures and they are sometimes... This and figures 3, 6, 4 and the other ones that were discussed are all embodiments and there are surely different ways to do this. But one thing that there's no dispute about, no dispute about, is that when the encoding occurs, the decoding occurs from MPEG to the analog forms that we human beings can appreciate, can receive, the streams have to be separated. That's just... That's what any person skilled in the art would know. Now, with respect, finally, to Mr. Dunner's argument about separates, okay, the claim... The judges claim construction that the issue here is the judges... They didn't ask for any particular explication of the word separates. They didn't. What they said was that the... the media switch element, which is the one, two, the fourth element in Claim 1 and Claim 32, that element, they gave a 55 word explanation for what media switch should be defined as to include... It says the media switch element should be construed to require that the media switch, and I'm leaving out the irrelevant stuff, output two distinct streams, one video MPEG stream and one audio MPEG stream. Now, we've been talking a lot this morning about the streams that come out of the hard drive to the output section, but this is a limitation that they are asking to be read into the media switch element. The media switch has two functions, okay? One is that it parses said MPEG stream, and the other is that the MPEG stream is separated into its video and audio components. It doesn't say video and audio streams, and it doesn't separate them logically or physically into streams. The genius at the core of this invention is separation at the component level. That is, the way that the CPU, the higher program logic, gets liberated from having to run like a maniac up and down this massive data stream every time it gets a load on our couch, is the building of a logical table of events that says, you know, aha, this is an audio component, it appears at this sequential place, it starts here, it's stored here, it's this long, and when a command comes in, the CPU only has to deal with that table, and they build the table, we build the table, and that is the invention here. That is the way in which a low-cost, limited CPU device can manipulate these streams the way that they do. Now, they are asking that this claim language, or this independent claim, require that the separation be physical, and that what the media switch do, separate it into streams. Okay? Now, as to whether the separation can be, let's leave streams aside, let's assume that we're really talking about components, which is not the construction that they ask for at mark-mit or at trial. They ask for streams, and what they're saying, if streams were required, what they say is, okay, well, there's an embodiment disclosed in the specification that is reflected in figures four and six, and the that shows that for a very brief moment in time, in order to build this logical table, you can put the, you know, you can say, aha, this is an audio component, stick it in the audio buffer. This is a video component, stick it in the video buffer for, I mean, we're talking about millions of a second until they're stored on the hard drive. And because there is this transient physical separation of into these circular buffers, which actually hold the data for a millionth of a second, that's physical separation. Well, that is one way in which you could go about building this logical table, and in fact, it is the way that is claimed in dependent claims eight, nine, ten, and eleven, which do disclose that separation can occur by use of separate audio and video buffers, but the independent claim doesn't require it. And if what were required were streams, even under their construction, even we never practiced our own invention. It is true that the inventor testified that when the machine was first developed, they created the logical table by a temporary separation into an audio and separate audio and video buffers. Neither he nor anyone ever said, ever said that that was required in order to build a logical table, and clearly isn't because their Broadcom boxes don't. Dr. Polish, the celebrated Dr. Polish, was asked whether or not a particular example of prior art which did not ever even transiently put new separate buffers practiced the media switch element, and he said yes, and he was asked at a cross-examination, is that because the media switch element only requires logical separation and not necessarily physical separation? And he said yes, that is correct, and that of course is exactly how our experts construed this plain language both at the Markman hearing and at the Broadcom hearing. The idea is the media switch has to analyze this massive data that comes in at millions and millions of bits a second, and it has to figure out what each one of those looks for each start code detector and says is this audio or is it video, and where does it come, and it sort of tags them, and it shows, I mean one visual is on figure 7 where it shows that it comes in from the encoder to a parser, and what comes out of the parser, a single line, are tags, and the tags are the logical segments that are revealed in figure 4, which is, is it audio or video, what's its sequential number, how long is it, and where can it be found, either in the temporary buffer or later in storage, so that when the CPU gets a command and says I want to start, you know, 10 minutes into Friends episode 32, and I want to see it at 16 times the normal speed, all it has to deal with is this logical table of events, and it then sends a command to the DMA engines that extract this data from the storage. Thank you. Thank you, Mr. Waxman, your time has expired. Mr. Gunner, let's see, I think that was about an extra 23 minutes. You've had the disadvantage of having considerably less time at the front end than your adversary, but you have the now corresponding advantage of having a considerable additional amount of time to use if you need it, in contrast to me, all the time that I see I have, which is more time than I had when I started. Quantum mechanics in this course. I think I've read the testimony of a lot of the expert witnesses, but I've just heard the testimony of another expert witness, Mr. Waxman. If you parse his testimony when you get a transcript of it, you will find that much of what he said is not supported in the record. I've heard arguments for the first time today. He talked about how these machines work. I've never used a Thilo or EchoStar machine. My grandchildren can tell you more than I know. But the fact is... I always thought it was just enough if I could get my hands on the remote. So... I've not achieved that success. But the fact is that we're dealing here with a specification, and we're dealing here with what it teaches. Mr. Waxman talked about even your device wouldn't be covered on the question of separation. The record shows, and we cite it in our blueprint, that when Thilo got its chips from Broadcom, Broadcom wanted it to use a device that didn't separate. They said, no, we don't want to do that. And their inventor, Barton, says it's got to separate to create an index. Mr. Waxman did not respond to my point about the sequence. In their brief, they argue that the sequence is that the indexing is actually the separating. Figure 6 shows that the index can't be the separating. The indexing follows the separation. Because if you look at column 5, you will see that there's a sequence of events. The sequence is you create audio components, you create video components, you separate them, and you put them into buffers. And at the same time, you create an event buffer, which tells you where it is. And then figure 6 shows lines going to logical segments being created thereafter. That is the creation of the index. That is the logical separation. And when Mr. Waxman distinguishes between components and streams, that's a figment of his imagination. When you look, if you separate the components and then put them into separate streams, they become a stream, as shown in figure 3. He doesn't respond to any of that. Now, I'm sort of jumping around, but I want to go back to the beginning when he was asked whether a split award would affect what's going on in this case. A split award would affect what's going on. Because if you look at the jury award, they had separate verdict forms for the Broadcom chip and for the what he calls the 50X chip, which I've been told, or DVR, which I've been told is the 50X, whatever. The point is that different devices are involved. There are different numbers of sales with those devices. It could affect damages. It could affect the injunction if there's a split decision. I'm hoping we don't reach that point, because we're asking for a conflict decision. And I'm sure Mr. Waxman would feel the same way. So if there's a split decision, you're saying that split in the sense that we hold some of the hardware hypothetically, some of the hardware infringement parts erroneous, but other parts correct. You're saying we would have to remand it. We couldn't just decide the case here. That's what I'm saying. It depends on what the nature of the split is. For example, the separated limitation affects the Broadcom DVRs. The assembles limitation affects the 50X DVRs. Those are different devices. If you rule for us on separated and rule against us on assembles or vice versa, it could affect what happens below. I could see how it would certainly affect the injunction. And it could affect damages too. That's the question I was wrestling with. Do you think it would affect the damages? Different numbers of 50X devices, different numbers of Broadcom devices. So we'd have to go back. We'd have to look at that. And then there'd be a question of whether we needed a new trial. The basic rule is if one can discern from the jury verdict what portion is applicable to each, then one might need a new trial. That typically is not the case. I remember Mr. Waxman talked about that our argument has nothing to do with what those words got. What Thiebaud actually invented is described in the patent. The patent shows unmistakably that there must be separation. It is necessary to have separation. In the drawings, it actually shows the separation, figure 3. And it shows these components 302, 304, well, different components, 302, 303, 405, 607, separated into different streams. And when we call them components or streams, they are necessarily separated. Now, Mr. Waxman talked about Claims 8 to 11 as though that helps Thiebaud's case. Claims 8 to 11, I submit, helps Ephesus' case. Because if you look at Claim 8, it says the process of Claim 1 further comprises the steps of placing said video component into a certain audio buffer. That goes back to Claim 1. You have to have a video component in Claim 1. There has to have been something separated in Claim 1 for you to put it in a separate buffer. And Claim 9 says the same thing about the audio component. Well, I don't think Mr. Waxman is arguing that Claim 1 doesn't separate the video and audio components. He's arguing that its separation can be logical, not physical. And I'm saying, Your Honor, that you can't put a logical audio component into a buffer. You have to put a physical audio component into a buffer. You have to put a physical video component into a buffer. That's the point. He's saying Claim 1 is generic. It has some generic concept. It doesn't. Right. But of course, his argument is that that demonstrates that with respect to a subset of all separated components, this is how you handle them. Do you understand that? This is a claim differentiation argument, essentially, I think. I don't think this is claim differentiation. The argument is in the nature of claim differentiation. You think the argument fails, as I understand it. Yes, I think it fails. You think it fails because Claim 8, if I understand you, you think it has to be read back to indicate that the kind of video component cannot be logical, and it's demonstrated by the fact that a video component of the type described in Claim 1 is being put in the circular video buffer. Yes. I understand. And moreover, if you look at Claims 8 to 11, and I was about to say time is short, but I entirely forgot. And you have more than we do. I'll try to scare you then. I'll try to equalize the situation. The fact is, if you look at Claims 8 to 11, you see a timing sequence. You see a sequence of going back to Claim 1, first you separate, physically separate the audio and video components. Then you put them into buffers, and then you create a notice. You create a notice at the end of Claim 9 and the end of Claim 8. And then after the notice is received, you retrieve the event posting from the event buffer. And then you index it. And that's my point. That's what's shown in Figure 6. It's a sequence of events. Indexing is not separating. They are clearly separate things. And I don't think Mr. Waxman really responded to that. You'll be able to find out when you re-read the transcript. But I think what you're going to find is you're going to find that Mr. Waxman was doing more testifying today than arguing. He was saying one skill in the art would know this, and one skill in the art would know that. There was no challenge to our position about for example on the assentment step. No challenge in the briefs to our position that the 50X DVRs do not assent them. The question is can you create is the plain language susceptible of interpretations meaning a separate audio stream and a separate video stream? The fact is that I understood at least in part Mr. Waxman's argument was building on Dr. Gibson's testimony and explanations to the jury, which apparently were largely accepted. Am I mistaken about that? Your Honor, you referred to Dr. Gibson but the thing I'm talking about now specifically I assume that there are no factual disputes, that there are legal issues, claim construction issues only, for the separating and the assembling limitation. Dr. Gibson never said that the 50X DVRs store the audio components, the audio data and the video data together or separately. He never said they assemble them. The fact is, I'll give you a cite, 2358 2359, the 50X DVRs storing audio and video data separately on the disk drive. There is no testimony. I didn't memorize. There was so much that Mr. Waxman said in his presentation that I didn't write everything he wrote down, but I can tell you there is no factual dispute. He said that there's a substantial evidence issue on the assembles. There isn't. It is a claim construction issue. I submit, if you look at the briefs and you look at our citations, there's no dispute on the basic facts that the 50X does not assemble, and there's no basic dispute on the fact that the Broadcom DVRs do not separate. The question is, what are the implications of that in terms of claim construction? And I submit that we have the better side of that argument. Now, Mr. Waxman said that all of our arguments have nothing to do with what I wasn't going to go into this, but I will mention it. On A7374, there is a chart. It's titled PIVO Patent Universe, and it starts out it has some boxes and it has the 389 patents, and it talks about two continuations with broad claims, and then it mentions a whole batch of additional patents. Continuation with broad claims. Continuation with broad claims. Continuation with broad claims. Continuation with broad claims. There may be some universe, if you look at all their patents, in which they claim X, and in no one they claim Y, and in no one they claim Z. In this case, they claim what the claim said, and the claims talk about separating as we are interpreting the word separating, and they talk about assembling as we are interpreting assembling, and we argue below, if you look at the claim construction memo, we argue pretty much what we're arguing today. I would say exactly what we're arguing today, and Judge Folsom below decided he decided not to interpret the word assembles. He decided not to interpret the word separates, leading to the problem that Judge Flager addressed, namely, in effect, we have a black box situation here, so I can tell what happened. I'll tell you what I think happened. What happened was, PIVO had very effective counseling, and they poisoned the well. They poisoned the well because we were unable to tell the jurors that there, in fact, was emergency rule, two opinions freeing us from, in their view, from liability. Those opinions were relied on by Judge Folsom in denying enhanced damages and attorney fees. When the jury hears arguments like that, and they hear that they didn't get an opinion because they were afraid to get an opinion because they knew that no lawyer would tell them they didn't infringe, I've been in enough trials to know that if I can make an argument like that, I've got that jury locked up. That jury is going to really sympathize with my case and not sympathize with the other case, and they were not happy in this case. They bought what I submit as a bill of goods. Well, just since he doesn't get another crack at you, let me just make a comment. That's one of the bases we have. When I read your blue brief and your point about, and they never got a written opinion argument, I was quite persuaded by that. But then I read their brief and they put it in the context, if you look at red brief 55, they put it in the context of the fuller discussion which clearly was referring to the Becking and Cannon opinions, and the reference, and they never got a written opinion, clearly seems to relate back to that discussion. I just make that point, that I assume the jury heard it in that context. Your Honor, let me respond to that point. I don't have a line in front of me, but I remember it. It starts out by reference to two lawyers, and I never can remember the name of the firm, or whichever it is. I remember the name, but I can't pronounce it. You apparently have read it, and so it may be that you will have that view when I'm through. But when you hear that entire argument, it starts out with words about the firm, and then it starts to generalize, and it says they didn't get an opinion because they were afraid that if they got an opinion it would be a negative opinion. When they knew, they knew that there were two Merchant and Gould letters saying exactly the opposite of what they were saying. I submit to you, Your Honor, with reference to your reading of this thing, that the jury is hearing no, they didn't do it, no lawyer would give them that. That does not mean the Bosacek firm wouldn't give it. That means no lawyer would give it, and that's our point. Fair enough. Well, in any event, let us talk about the adjacent chip on the software claim.